Jerry COOK, et al., Plaintiffs,

v.

Michael ESPY, in his official capacity as Secretary of Agriculture, United States Department of Agriculture, et al., Defendants.

Civ. A. No. 2:94–0050.

United States District Court, S.D. West Virginia, Charleston Division.

June 27, 1994.

Michael Miskowiec, W.Va. Legal Services Plan, Inc., Charleston, WV, for plaintiffs.

John Koch, Dept. of Agr., Washington, DC, Rebecca A. Betts, U.S. Atty., Carol A. Casto, Asst. U.S. Atty., S.D.W.Va., Charleston, WV, Frank Hunger, Colleen Grzeweskowiak, Thomas Millet, Dept. of Justice, Civ. Div. Washington, DC, for defendant Espy.

Emily A. Mead, Asst. Atty. Gen., Office of the Atty. Gen., Charleston, WV, for defendant Lewis.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This case tests the legality of an aspect of the United States Department of Agriculture's ("USDA") administration of its food stamp program barring from participation in the program those who own modern equivalents of "welfare Cadillacs." *See* 1977 U.S.C.C.A.N. 1971, 2067. The controlling issue is under what circumstances a motor vehicle may qualify as an "inaccessible resource" and thus not countable against eligibility for food stamps. 7 U.S.C. § 2014(g)(5). Plaintiffs, whose food stamp benefits were terminated when they purchased a new automobile, argue their car should be considered an inaccessible resource because the amount they owe on it exceeds fair market value. The USDA contends motor vehicles do not qualify as inaccessible resources as a matter of law. This is a question of first impression in this District and in the Fourth Circuit.

### I.

The prerequisites of food stamp eligibility are set forth in 7 U.S.C. § 2014.[1] Allowable financial resources of households participating in the food stamp program are limited to $2,000, or if the household includes a member at least 60 years old, $3,000. 7 U.S.C.

---

1. Eligibility for participation in the food stamp program is determined on the basis of national standards. 7 U.S.C. §§ 2014, 2017. The program is administered by state agencies, like the West Virginia Department of Health and Human Resources ("WVDHHR"), which make the actual eligibility determinations, figure the appropriate amount of stamps to be issued to eligible households, and issue the stamps. 7 U.S.C. § 2020.

§ 2014(g)(1). The statute prescribes what assets count toward household resources, and specifically sets forth a method for assessing the resource value of a motor vehicle:

> The Secretary shall . . . include in financial resources . . . any licensed vehicle (other than one used to produce earned income or that is necessary for transportation of a physically disabled household member and any other property, real or personal, to the extent that it is directly related to the maintenance or use of such vehicle) used for household transportation or used to obtain or continue employment to the extent that the fair market value of any such vehicle exceeds $4,500. . . .

7 U.S.C. § 2014(g)(2).[2]

USDA regulations provide that the portion of a vehicle's value which exceeds $4,500 [3] "shall be attributed in full toward the household's resource level, regardless of any encumbrances on the vehicles. . . . regardless of the amount of the household's investment in the vehicle, and regardless of whether or not the vehicle is used to transport household members to and from employment."[4] 7 C.F.R. § 273.8(h)(3).[5]

Congress began counting a portion of the fair market value of vehicles toward household resources in 1977. Pub.L. 95–113, Title XIII, § 1301, 91 Stat. 962 (1977). Before

then, a licensed vehicle used for household transportation was exempt from consideration as a countable asset regardless of its value. The equity value of a second car used for a purpose other than employment or production of income counted toward household resources. Noting that under the pre–1977 regulations, "every food stamp household is entitled to own any make, model, and year of car it can afford," Congress stated that under the revised program, "[t]he equity value of a household in such vehicles would be irrelevant. Only the excessive market value would jeopardize program participation." 1977 U.S.C.C.A.N. 2066–67.

The legislative history clearly explains Congress's rationale for modifying the former method of accounting for vehicles:

> It is not the Committee's intention in including the partial market value of some automobiles as assets to make many persons ineligible who are otherwise needy virtue [sic] of the income standards of eligibility. But the Committee does not intend either to tolerate abuses of the kind that make the program subject to public criticism. If there is such a thing as a welfare Cadillac, there ought not to be . . .

1977 U.S.C.C.A.N. 2067.

In 1990, Congress added another provision to 7 U.S.C. § 2014(g) which excludes certain

---

2. USDA regulations regard as the fair market value of a vehicle the wholesale value listed in "publications written for the purpose of providing guidance to automobile dealers and loan companies." 7 C.F.R. § 273.8(g). As an example of such a publication, the regulations cite the National Automobile Dealers Association's ("NADA") Used Car Guide Book. *Id.*

3. Although Congress recently amended the 7 U.S.C. § 2014(g)(2) "fair market value" provision to increase the vehicle limitation, the amendment does not affect the proper valuation of plaintiffs' vehicle in this case. The vehicle limitation will be raised to $4,550 on September 1, 1994, to $4,600 on October 1, 1995, and to $5,000 on October 1, 1996. After October 1, 1996, the vehicle limitation will be adjusted on each October 1 to reflect changes in the new car component of the Consumer Price Index. *See* Omnibus Budget Reconciliation Act of 1993 (P.L. 103–66, approved August 10, 1993), H.R. 2264, 103rd Cong., 1d Sess. § 13923, 139 Cong.Rec. H5792–01, H5886 § 13923 (1993).

4. In households with more than one vehicle, the equity value of certain vehicles may be used in

calculating the household eligibility to participate in the food stamp program, but only if the equity value is greater than the amount by which the fair market value exceeds $4,500. 7 C.F.R. § 273.8(h)(4), (5), (6).

5. In summary, the regulations provide:

> [E]ach licensed vehicle shall be handled as follows: First it will be evaluated to determine if it is exempt as an income producer or as a home. If not exempt, it will be evaluated to determine if its fair market value exceeds $4,500. If worth more than $4,500, the portion in excess of $4,500 for each vehicle will be counted as a resource. The vehicle will also be evaluated to see if it is equity exempt as the household's only vehicle or necessary for employment reasons. If not equity exempt, the equity value will be counted as a resource. If the vehicle has a countable market value of more than $4,500 and also has a countable equity value, only the greater of the two amounts shall be counted as a resource. 7 C.F.R. § 273.8(h)(6).

"inaccessible resources" from the household asset calculation. As amended in 1991, the statute provides, in relevant portion:

> The Secretary [of Agriculture] shall promulgate rules by which State agencies shall develop standards for identifying kinds of resources that, as a practical matter, the household is unlikely to be able to sell for any significant return because the household's interest is relatively slight or because the cost of selling the household's interest would be relatively great. Resources so identified shall be excluded as inaccessible resources. A resource shall be so identified if its sale or other disposition is unlikely to produce any significant amount of funds for the support of the household....

7 U.S.C. § 2014(g)(5).

The USDA has published an Administrative Notice advising state food stamp agencies to exercise their "best judgement" in applying the inaccessible resources provisions of 7 U.S.C. § 2014(g)(5) until rulemaking is accomplished. The USDA has not yet proposed regulations to implement the inaccessible resources provisions of the statute. On January 31, 1992, the Deputy Administrator of the Food and Nutrition Service issued, under authority of the Secretary of Agriculture, a notice to its regional offices stating that the inaccessible resource provisions of 7 U.S.C. § 2014(g)(5) do not apply to motor vehicles. The regional offices, in turn, disseminated this directive to all state agencies administering the food stamp program.

## II.

In August, 1993, plaintiffs Jerry and Stacy Cook were receiving food stamps for themselves and their three children. When their 1984 Ford LTD stopped running, they purchased a 1993 Toyota Tercel for $8,000. With a cosigner, they acquired financing for the car through a federal savings and loan. They use the car for household transportation.

On September 2, 1993, the Fayette County office of the WVDHHR notified plaintiffs they were no longer eligible for food stamps because the $8,000 fair market value of the car gave them $3,500 of excessive assets.

Plaintiffs received no food stamps after September 30, 1993.

Plaintiff Stacy Cook reapplied for food stamp benefits at WVDHHR's Fayette County office on January 13, 1994. On that day, plaintiffs owed $8,520.80 on the car. Her application was denied because according to the NADA Used Car Guide Book, the fair market value of the car at the time was $7,000, and she therefore had $2,500 of excessive assets.

Plaintiffs allege here their car is an inaccessible resource within the meaning of 7 U.S.C. § 2014(g)(5), because its sale would produce no return since the amount of the lien exceeds the car's fair market value. They contend the vehicle should be excluded from food stamp eligibility determinations. Plaintiffs claim as well the USDA's instruction to state food stamp agencies regarding the scope of 7 U.S.C. § 2014(g)(5) is void as violative of the rulemaking provisions of the Administrative Procedures Act, 5 U.S.C. § 553, because it was issued without notice or opportunity to comment.

## III.

█ In general, a motion to dismiss for failure to state a claim should not be granted unless it appears certain the plaintiff can prove no set of facts that would support its claim and would entitle it to relief. *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994); *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989) (*quoting Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), and *Johnson v. Mueller,* 415 F.2d 354, 355 (4th Cir.1969)). In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *See, e.g., De Sole v. United States,* 947 F.2d 1169, 1171 (4th Cir.1991).

## IV.

█ This case calls upon the Court to define the interplay between 7 U.S.C. §§ 2014(g)(2) and (g)(5). As noted in the

introduction, this is a matter of first impression in this District and Circuit. When interpreting a statute construed by the agency administering it, the Court first looks to the language of the statute to determine whether Congress has directly spoken to the precise question at issue. *Mead Corp. v. Tilley*, 490 U.S. 714, 722, 109 S.Ct. 2156, 2161–62, 104 L.Ed.2d 796 (1989); *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); *Newport News Shipbuilding & Dry Dock v. Howard*, 904 F.2d 206, 209 (4th Cir.1990). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781. "If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. (footnotes omitted).

■ The statute at issue is not a model of clarity. Before the addition of § (g)(5) in 1990, it appears Congress intended motor vehicles used for household transportation or to obtain or continue employment be treated generally as countable financial resources to the extent their fair market value exceeded $4,500. 7 U.S.C. § 2014(g)(2); *see supra*, pp. 1097–1098. It is not clear, however, whether Congress meant for the 1990 amendment adding § (g)(5) to limit the reach of § (g)(2) to those licensed vehicles in which a household has an equity interest.

Plaintiffs argue Congress intended to allow a licensed vehicle to qualify as an "inaccessible resource" within the meaning of § (g)(5), and that this intent is discernable from the statutory language. This construction of the statute is tenable, but not necessarily controlling.

Section (g)(2) deems licensed vehicles used for household transportation or to obtain or continue employment "financial resources." Section (g)(5) provides "[a] resource shall be [deemed an inaccessible resource] if its sale or other disposition is unlikely to produce any significant amount of funds for the support of the household." Resources determined under § (g)(5) to be inaccessible are excluded from the calculation of allowable financial resources. Presumably, under plaintiffs' construction, a licensed vehicle in which a household's equity interest is "relatively slight" would qualify as an exception to § (g)(2), regardless of the vehicle's fair market value.

Both Congress and the USDA have mandated that other licensed vehicles be excepted from the fair market value analysis. Licensed vehicles used to produce earned income, like taxis or delivery trucks, or for transportation of a physically disabled household member are excluded from calculation of allowable financial resources by § (g)(2). When Congress enacted 7 U.S.C. § 2014(g)(4) in 1988, allowing exclusion from resource calculation of farm property of self-employed farmers until one year after their farming operations ceased, the USDA amended its regulations to exclude from resource calculation licensed vehicles used in the farming operation until one year after the operation ceased. 7 C.F.R. § 273.-8(h)(1)(i). The USDA excluded these licensed vehicles used in farming operations from the fair market value provision of § (g)(2) even though § (g)(4) does not mention licensed vehicles or reference § (g)(2). Plaintiffs argue the USDA should likewise exclude heavily encumbered vehicles under § (g)(5).

On the other hand, the USDA argues Congress intended licensed vehicles be regarded separately from other resources in the resource calculation, because Congress provided in § (g)(2) a specific method of valuation of licensed vehicles. This construction of the statute is reasonable as well.

Section (g)(2) specifically addresses licensed vehicles used for household transportation or to obtain or continue employment, requiring their fair market value exceeding

$4,500 be counted as a financial resource. While § (g)(2) specifically prescribes the appropriate means of evaluating the resource value of licensed vehicles, § (g)(5), added 13 years later, contains no mention of vehicles. It is an elementary principle of statutory construction that a specific provision controls a general one. *See, e.g., Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 375, 110 S.Ct. 680, 686–87, 107 L.Ed.2d 782 (1990). Viewed in context of this precept, the USDA contends its interpretation of the statute is correct beyond cavil.

The USDA argues its exclusion pursuant to § (g)(4) of licensed vehicles used in farming operations is consistent with § (g)(2) and in strict accordance with its language. Section (g)(2) specifically excludes from fair market value analysis licensed vehicles "used to produce earned income." Licensed vehicles used as farm equipment by self-employed farmers are necessarily used for income production, and are therefore expressly excluded from fair market value valuation.

Both plaintiffs' and the USDA's interpretation of 7 U.S.C. § 2014(g) are sensible readings of the statutory language. The legislative history of the subsections supplies little guidance to an evaluation of their interplay. It does establish that when it added the fair market value provision to § (g)(2) in 1977, Congress intended the equity value of licensed vehicles be disregarded. 1977 U.S.C.C.A.N. 2066–67; *see supra,* p. 1097. It appears from the legislative history Congress considered the fair market value method of accounting for licensed vehicles a proper means of quelling abuses of the food stamp program and quieting public criticism. *Id.*

Neither the language of § (g)(5) nor its legislative history indicates Congress' predilection for the fair market value method has changed. As the USDA notes, the fact Congress acted in August, 1993 to increase the § (g)(2) vehicle limitation and provide for automatic inflation-indexed increases in the future suggests it has no present intention of departing from the fair market value method of vehicle valuation. *See supra,* p. 1097 n. 3.

The USDA contends Congress did not break new ground by adding § (g)(5)'s *inac-*

*cessible resources* provision to the statute. It notes USDA food-stamp regulations for many years have included exemptions for inaccessible resources such as irrevocable trust funds, security deposits on rental property or utilities, and property in probate. *See, e.g.,* 43 Fed.Reg. 47901 (October 17, 1978). Congress codified the inaccessible resources provision, according to the USDA, to "save paperwork for State agencies and households," 136 Cong.Rec. H11848–04, H11862 (October 23, 1990), and to "simplify the resource determination" by eliminating the need to calculate a fair market value for assets in determining whether they qualify as inaccessible resources. *Id.*

## V.

■ The view of an agency charged with administering a statute is entitled to considerable deference. *See, e.g., Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83; *Asare v. United States Parole Comm'n,* 2 F.3d 540, 543 (4th Cir.1993). To sustain the agency's interpretation, the Court need not find that it is the only permissible construction which the agency might have adopted, nor that it is necessarily the result the Court would have reached, but only that the agency's understanding of the statute is sufficiently rational to preclude a court from substituting its judgment for that of the agency. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83; *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985).

■ If an agency charged with a statute's enforcement interprets the statute's textual ambiguities in such a way as to accommodate conflicting policies reasonably, the Court must not disturb the agency's interpretation unless it runs counter to the statute's language or legislative history. *Dep't of Treasury, I.R.S. v. Fed. Labor Relations Auth.,* 494 U.S. 922, 932, 110 S.Ct. 1623, 1629, 108 L.Ed.2d 914 (1990); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), *reh'g denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *Hicks v. Cantrell,* 803 F.2d 789, 792 (4th Cir.1986).

The USDA's interpretation of this statute is not necessarily the result the Court would have reached if the question initially had arisen in a judicial proceeding. Nonetheless, because the interpretation is reasonable, it is entitled to deference.[6]

Plaintiffs contend, however, the USDA's interpretation of the scope of § (g)(5) should not be accorded deference because it has not been reduced to a regulation; it should be voided as violative of the rulemaking provisions of the Administrative Procedures Act, 5 U.S.C. § 553, because it was issued without notice or opportunity to comment. The only other court to consider this issue agreed. *Valenzuela v. Espy*, No. CIV 93–456 TUC RMB, slip op. at 8 (D.Ariz. 1993) (unpublished) ("The Court finds that because the Secretary has not yet issued the required formal regulations that implement the inaccessible resource provisions of 7 U.S.C. § 2014(g)(5), the interim directive is not entitled to judicial deference.")

In *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 439, 106 S.Ct. 1931, 1938–39, 90 L.Ed.2d 428 (1986), the Supreme Court held the FDIC's interpretation of a statute was entitled to *Chevron* deference "although the FDIC's interpretation of the relevant statute has not been reduced to a specific regulation. . . ." Our Court of Appeals likewise has held promulgation of a regulation is not a prerequisite for according respect to an agency interpretation. *Monongahela Power Co. v. Reilly*, 980 F.2d 272, 279 (4th Cir.1992) (EPA administrator's reasonable interpretation of statute, which was silent on issue presented, was entitled to deference, even though position was not result of completed agency rulemaking or fact-finding adjudication and was asserted in litigation against agency); *Deel v. Jackson*, 862 F.2d 1079, 1087 (4th Cir.1988), *cert. denied*, 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 991 (1989).

Plaintiffs argue the USDA's interpretation of the statute is an "ad hoc rationalization" formulated solely for purposes of litigation. This assertion is unconvincing, for it appears the USDA consistently has maintained its position with respect to the inapplicability of § (g)(5) to licensed vehicles from its initial pronouncements to date. However, even if this Court were to conclude the USDA's interpretation of the statute was merely a litigation position, that fact alone might not strip the agency's interpretation of its entitlement to deference. *Monongahela Power Co.*, 980 F.2d at 279 n. 7 (noting justifications generally advanced for discounting agency litigating position were "conspicuously absent" where there was no indication the interpretation did not reflect the view of agency heads or was developed hastily without presentation of contrary views).

The USDA has met its burden of demonstrating its interpretation of the statute is reasonable. *Monongahela Power Co.*, 980 F.2d at 279. Accordingly, the Court must defer to the USDA's interpretation. Viewing the complaint in the light most favorable to plaintiffs, the Court concludes plaintiffs can prove no set of facts which would support their claim and entitle them to relief. The Court therefore **GRANTS** the USDA's motion to dismiss. Because the state defendant's position parallels the USDA's, there are no remaining issues for litigation. The Court **ORDERS** this action **DISMISSED** and stricken from the docket.

The Clerk is directed to send a copy of this Order to counsel.

---

6. In *City of Chicago v. Environmental Defense Fund*, —— U.S. ——, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994), the Court wrote: "It is not unusual for legislation to contain diverse purposes that must be reconciled, and the most reliable guide for that task is the enacted text." *Id.* at ——, 114 S.Ct. at 1594. In *City of Chicago*, the Court rejected an agency interpretation of a statute which "goes beyond the scope of whatever ambiguity" the statute contained.

Such is not the case here. The USDA's interpretation of § (g)(5) is based on a reasonable reading of the statute's text and goes no further than is necessary to resolve the ambiguity within the statute. The construction is a reasonable attempt to accommodate the conflicting policies of the statute. *Dep't of Treasury, I.R.S. v. Fed. Labor Relations Auth.*, 494 U.S. 922, 932, 110 S.Ct. 1623, 1629, 108 L.Ed.2d 914 (1990).